Good morning, Your Honors. May it please the Court, my name is William Hobson and I represent Donald Chapman. Mr. Chapman was a 17-year-old, excuse me, an employee of the United States Postal Service who, after a discipline-free 17-year career, was terminated from his employment. He appeared, he began to develop certain problems with his walking in 1999 and had cervical fusion surgery in 2000 in the summer. He returned, he was off duty, and he returned to work in September, September 21st, with a doctor's report indicating his, that he had limitations on his duty, on his work performance. He could walk no more than 500 feet. He could lift no more than 20 pounds. He was indicated that he had a spastic, a partial paralysis of his leg, 80 percent reduction in his, 80 percent limitation on his right arm, numbers of other limitations. He was back at work for a day or so, and his supervisor, a woman by the name of Venaja, and I can't pronounce her whole name, who walked him off the floor, said, we don't have work for you here, essentially put him off duty and on a non-pay status. Well, that's, that skips a few beats, I think. And he came in and he said, here are the limitations I've got. They offered him another job, which he turned down. Correct. Because he said, I can't do it with the problem I've got with the hand. Correct. Because of repetitive motion. And she went out and scoured around to see if there were any other available jobs, couldn't produce any. Correct. She was in the room. So it isn't just entirely accurate to say that she came in and just off the floor and ---- I understand, Your Honor. She did, however, four days after he came back, I'm sorry, it's the 28th, he's back on the 21st, on the 24th she walks him off the floor, and on the 28th he, she informs him that he has this choice, a sick leave, take sick leave, or leave without pay. And those are his choices. Okay. As a practical matter, what other choices were there? Well, the, as a practical matter, what she could have done is referred him, pursuant to the Postal Service's policy, to the Reasonable Accommodations Committee. Their own, their own brochure for how ---- Which was done, what, in October? No, ma'am. It was done in January. January. And, well, that's when it went to the committee. When was it referred? That's the, that is their interactive process. It's January 6th, I think, that an agent nominates him in January of 01, and in January, I think January 24th, he actually appears in front of the RAC Committee. So that's, that's a period of approximately four months. The district's, the, excuse me, the Postal Service's own policy says 20 days. That wasn't done. He does, Mr. Chapman does in October file certain EEO charges, which he, which include a number of factors. He does them on his own, and he ultimately doesn't pursue them. But he essentially puts the Postal Service on notice that he has discrimination complaints. The, Mr. Chapman is offered, when he's in front of the RAC Committee, he's offered this. He's, he's told, you can be reassigned to another craft. Now, reassignment to a craft is not the same as a reassignment to a job. If you're reassigned to a craft, and the reason he rejects it is that you lose all your seniority. When you, when you lose your seniority, you sit there and wait to be called, because you're the, you're the bottom guy on the, on the totem pole. So rather than having 17 years seniority, he would have none if he went to be a clerk or went to be a mail carrier. And there's no effort to accommodate his disability, per se. You know, what are the essential functions of the job? What can we do to meet them? The other thing they offer him is medical retirement. And he rejects that because it's a, his explanation was that that would result in me getting 25 percent of my income. It's a draft reduction. Okay. Help me out a little bit, if you will, on the options. Because if I understand it correctly, whether you can be put on, I may have this backwards, but whether you can be put on light duty depends upon the terms of the collective bargaining agreement. And whether you can be put on limited duty depends upon there being a ruling by the board that you have a work-related injury. I've had a bunch of these cases, and that's my recollection of what the, the strictures are for the Postal Service. So if that's true, what, what at that point were the practical options? Well, I think that unless the Postal Service is not subject to Barnett, I think that whether or not it's light duty or limited duty in some sense doesn't matter. Because although the CBA can be a factor in determining whether or not you get some particular reassignment or not, the simple fact is that the CBA is not a bar. One of the things that happened in this case is that at the conclusion of the case, when we, when we deposed Mr. Harris, he said, well, the CBA says we can't do this at all. And yet I deposed three other union officials who said that they were unavailable, that there were no positions available. The, on the one time that they, that they made the inquiry, Your Honor, that was, that was January. They made an inquiry. Were there available positions? They didn't do it anymore. But I deposed a number of union officials who said, I don't know what they're talking about. There were lots of reassignment positions available. So it, you know, they could have given him light duty is what I remember for positions that are not those OWCP positions that then become available. The essential point of, of the process, though, Your Honor, is that in the end, they are able to put him in a, when he, when he prevails on his OWCP form. Sure. But that then is easy because you've got a, you've got a ruling that he, he, he suffered from a work-related injury, and that entitles or at least enables him to have a limited-duty, specially created, handcrafted job, which he can't otherwise have. No, actually, what it, that's not exactly correct. What it does is to obligate the Postal Service to pay. And when they have to pay, there, and there's, there's information in the, in the record. When they have to pay, Mr. Harris, I think, writes a letter, writes a memo and says, if we're going to have to pay for this guy, we might as well work him. And that, that's exactly what they do. Well, yeah, but they can't do that before the ruling. Well, but that's not true, Your Honor. I think they, they absolutely could have. But you can't, you can't create a job. I mean, my understanding, I've never heard anybody make argument that a Postal Service can create a job for someone prior to having that ruling in hand. The Postal Service's own interactive process materials indicate that in terms of creating a job, what they can do is look at the job and decide what duties are essential or not. Oh, sure. It's a different issue. Well, but, but in, in terms of reassignment positions, there is, there is evidence in this record by three union officials that there were lots of reassignment jobs in the craft available. There were people who were on light duty. Mr. Chapman at one point believed that he was a victim of gender discrimination so he identifies lots of, of women employees and we, we're not pursuing that except to point out that, that to the extent the Postal Service says there were no light duty positions, that, that's, that's controverted by the record. There were numbers, there were numbers of persons identified and identified by, by union officials who you think would be, if the people are saying the CBA won't let you have, you know, do that, there's union officials are saying, you know, the CBA, you know, there are lots of positions available and don't, don't breathe a word about the CBA. Interestingly, Mr. Chapman had 17 years of seniority. So if the CBA gets to be a part of the puzzle, which it never was, you would think that given his seniority he would have bumping rights maybe or opportunities to, to, you know, to, to take positions as they become available. Just to help me out, can you give me an example of a position that was available in, in September or October, that kind of range, that he, that his limitations would have enabled him to perform? Well, Your Honor, I mean. Out of the record. I mean, you know, what, what's an example of an, of then available position that he could have done? He could have been able to perform the position he ultimately did. I mean, that was. Sorry, I just didn't understand you. I'm sorry. He could have been able to perform the position he did. He's in the craft and he's the guy who, who controls access, I think, as, as, as a recall. Well, he himself said he, he was finished in the mail handling business. Well, he's at a, he's, he's, he's at a, he's at a, a committee of, of people who are saying you have, you know, you have two options. Okay. You've just, you've just said, this is to help me out. You've just asserted that the record shows that there were lots of reassignment jobs available. So I'm just asking you, because I don't know anything about how the craft works or any of that stuff, if you could just give me out of the record a concrete example of a reassignment job that was then available that he could have performed. And I, I, forgive me. My recollection is that he indicated that there were, there were re-wrap positions that, that he, what are called re-wrap positions where they take packages that are. Re-wrap, okay. Yeah. And it's, it's kind of a lower velocity work schedule as I understand it. I, I, forgive me, Your Honor. I should have maybe had those union officials say, identify each of those positions. I, I asked them if there were available reassignment positions. They just said yes. And there's no concrete evidence that anything, any particular job that he could do was available. He identified a job. He, I think, I think re-wrap was, was one of the ones he said. There were also jobs that they pay people to do overtime to do. And I forget what that, that was. And that was in the, in the record. What's he doing now? He's, he, he is back working for the Postal Service. I know he is, but what's the job he's doing? I, I think he's the guy who, he's in the craft. He's the guy who, who controls the flow of access on and off the floor. He sits in a room and he manages a computer terminal and, and lets doors open and, and, and, and close and controls the flow of, of, of personnel. One of the complications in, in this case, Your Honor, is that, is that these folks talk about the, the essential functions of the job as if you've got to do all of it. But when you look closely at it, nobody ever does all the, all the essential functions of the job. And, and because they didn't do the interactive process that I think their, their own policy suggests, we don't really know what, what, what was essential and what was not. They're the people best able to know, and I think Barnett makes that point clearly, they're the, as the employer, they're the people best able to know what are the available positions that might be out there. Because they came to the RAC with, with the expectation that they're, that he's either going to retire or, or, or he's, or, or the option is to go to another craft, I think that was, they named two other crafts. Because of those things, he, he, you know, he was unable essentially to, to, to, to have the option to have a position that continued him in employment. It's interesting, you know, Mr. Chapman is an odd soul in some respects, but he's one of those people that believes that work dignifies. And when they were talking to him about retirement, I mean, he gets some military retirement, you know, not much, not enough, and he had some savings, which he, most of which he lost, and he could have gotten, had a little bit of money, but he said, I want to work, I want to work, and, and, you know, they need to, they need to accommodate me. I understand, and the record I think demonstrates, he's a difficult guy, and a difficult guy in a, in a, in a difficult time of his life. He's suffering this paralysis, he's, he's not getting much support from his, his employer. He's a, you know, he's, he's not an easy guy. But I, I think had the post service followed its policy for how it's supposed to engage in the interactive process timely, and more than once, I mean, one of the other points that's made is that they, they take him to this RAC process, they do it one time, and they don't ever say, Chapman, we need you back in here for another go-round with, with RAC. There are other positions we want to look at, or, you know, they don't do that. I just, you know, I think it, you know, the Postal Service should not be one of those agencies that doesn't fall under the ambit of the Rehab Act and the ADA. You know, what we're talking about here today is only money, and it seems to me that there's enough confusion in the whole record that maybe the two sides ought to be sent to mediation, and we have a good mediation service, rather than what you're asking us to do is to send a lot of these issues back for trial. Have you tried talking with the other side about this? We have chatted, and I'll let Mr. Lenka talk about that. We would certainly be willing to participate, and we have indicated previously we'd be willing to do that. Some of the rest of what I have to say is duplicative. The retaliation claim, we think, arises from the September request for accommodation that then is faced with, and I realize it's a little more complicated, Judge Reimer, than just walking him off the floor, but pretty quickly he's not given the benefit of the process that's contemplated, and then he's brought back four months later, and only that one time for the reasonable accommodations process. I'm close to my time. I'd like to ---- Why don't you just say that, and then we'll get back to you. I'm sorry. If you want, if you wish, you may save the rest of it, and we'll get back to you after we hear from Mr. Lenka. Good morning. May it please the Court, my name is Peter Lankin with the U.S. Attorney's Office, and I represent the United States Postal Service. I urge the Court this morning to affirm Judge Campbell's decision finding that there was no employment discrimination in this case. Your Honors, this case represents an excellent set of facts for the United States under the Rehabilitation Act. First, because Mr. Chapman cannot establish any of the three requirements for employment under the Rehabilitation Act, there are three prongs for a prima facie case under the Act. Because of that, there's no reason to even look at his accommodation claim. And thirdly, because of the legitimate reasons for the Postal Service's action, the temporal distinction between when he engaged in protected activity and when he was eventually terminated, there's no retaliation claim. I'd first like to address the prima facie standards under Toyota Motor, which started at page 22 of my brief. As you know, there are three prima facie standards. First, Mr. Chapman has to prove that he is disabled under the Act, wholly disabled from the central activities of daily living. Second, he has to prove that he has a walking impairment. And do you challenge that? Correct, Your Honor, we do. The United States does not oppose Mr. Chapman's assertion that he has a walking impairment. We fully admit that. Our own doctors, our own functional capacity evaluators said that he did. What we do object to is the fact that that impairment is substantially limited in the scope of daily living to all people's lives. Judge Chapman, I mean Judge Campbell, addressed that at pages 6 through 7 of his order, in which he did a straight sealer text Rule 56e argument stating that the plaintiff put forth no evidence to rebut the United States' assertion that Mr. Chapman was not impaired with respect to the general populace. There was nothing in the record, and Judge Campbell ruled in our favor. As Your Honors are aware, Title 29 of the Code of Federal Regulations, Section 1630.2i, states that major life activities are such as caring for oneself, performing manual tasks, walking, seeing, breathing, hearing, things like that. At issue here was working and walking. Now, there's a 2001 functional capacity evaluation conducted by Dr. Hyland. This is Supplemental Excerpt of Record No. 30, in which Dr. Hyland found Mr. Chapman to be independent in daily living. He noted that Donald drove to the appointment. He even said he could work for eight hours a day so long as he had a sedentary job. We also set forth really a litany of cases in which postal workers had walking restrictions and that both district courts and the Ninth Circuit Court of Appeals found them not to be disabled. I think some of the most telling would be the Penny case out of the Sixth Circuit. These are addressed in pages 24 through 25 of my briefs, Your Honor. There was a 14 percent total body impairment. The Kelly case out of the Third Circuit where the walking because of a hip replacement, they found that even though that plaintiff had significant walking restrictions, he still could walk and he wasn't impaired compared to most people in the general populace. A great case was out of the Southern District of New York, Your Honor, Garvin v. Potter. This was a postal employee with severe leg ulcers who couldn't walk a significant amount, couldn't do his job, but they found that he wasn't disabled under the Act. And it's important to note that just because someone has a disability under the Rehabilitation Act doesn't mean that they're disabled. This is probably the poorest choice of words that Congress could have chosen in drafting this Act. If you have some type of impairment, you have a disability, whether it's a walking disability or a thinking disability, and it doesn't necessarily mean that you're wholly disabled, meaning you just can't function in daily life. I might have a nervous disability, being as I'm talking very rapidly, Your Honor, but it doesn't mean I can't function as a lawyer. It doesn't mean that I can't perform the normal functions of people's daily lives. Well, it just does mean you need some accommodation. Correct. But you need accommodation within your craft, within your job. And I think that goes to the second prong of the prima facie case, Your Honor. Let me just clarify something. As I understood what Judge Fletcher asked is, but if you're impaired, that just means you need reasonable accommodation. Correct, Judge Reimer. Actually, an impairment, reasonable accommodation only comes in, it's reasonably accommodated if you are able to do the essential functions of your job. And if you are wholly disabled from that job, even with some type of accommodation, you cannot perform it, you fail under the second prong. It's a double-edged sword. And this is why it's a hard act for a manual laborer to be successful under, like Mr. Chapman. What happened is Dr. Lee Teller, this is Excerpt of Record Number 20, said that he needed a sedentary job. He couldn't lift over 20 pounds. He couldn't walk more than 500 feet. The case law, and this is at page 37 of my brief, Your Honor, in Title 29 CFR 1630, states that the United States Postal Service or any private employer can define what their job is. Page 37, the Birch case out of the Fifth Circuit, the Sutton v. Ladder case out of the Eleventh Circuit states that the Postal Service is not required to assign an individual outside of their position. The Thomas case cited in my brief states that, or Tehan, I'm sorry, this is at page 30, if someone's unable to do their job, you can actually fire the gentleman because there's nothing for him to do. Now, the essential functions of a mail handler are to handle mail, to lift sacks of mail, to unload trucks, to dump sacks of mail, to cancel stamps, to operate heavy machinery, to walk around, to move parcels. They're the workhorses of the largest postal sorting facility in the United States of America. And I think the most inapropos and blunt statement came from a member of the Reasonable Accommodation Committee. This is a plaintiff's statement of facts for summary judgment, paragraph 32, in which they told Mr. Chapman, we don't need people with a fine mind. We need people that can lift bags of mail. Mr. Chapman couldn't lift bags of mail, and the record is replete with evidence like that. Excerpt of record 190, this is at paragraphs 33 and 34 and 39, plaintiff's statement of facts. He stated that he was done being a mail handler and that accommodation in that position was not an option. His testimony to the District Reasonable Accommodation Committee, this is at our excerpts of record 26, 28, and 47. He stated that he was done with his craft, that he could not do it. Mr. Chapman also brought, I mean, Mr. Hobson also brought up a possible accommodation in the re-wrap position. What that is, is they set people at a table and give them a piece of tape, tell them to wrap up boxes of mail and lift and move them. Vanya Thinharden actually did offer that to the plaintiff. He said he could not do it because of the palsy in his right hand. The other accommodation which Mr. Chapman set forth was working in the sack room, which was just lifting empty sacks and stacking them, kind of cleaning up around, which they did offer people overtime to do. That's not an accommodation, Your Honor. That's something you give people a little extra money to help clean up after the fact, and that's not a full-time job. Even if it was, it's outside of the essential functions of his position, which is to lift over so many pounds. You need to compare, this is excerpt of record number two, the essential functions of his duties in the final agency decision, compared to Dr. Lettliler's restrictions in paragraph 20 where he says he needs a sedentary job where he can't lift much and he can't walk more than 500 feet compared to what the Postal Service describes as what is a job, which is walking around and lifting heavy bags of mail. And because he can't do that, he doesn't qualify under a prima facie case under the Rehabilitation Act. He can't do his job. The Postal Service can try to accommodate him, but if he can't, there's no way to accommodate someone who can't lift bags of mail to be a mail handler. He can't succeed under the Act. I think that establishes no prima facie case under the second prong, and we already addressed his ability, his walking impairment in relation to the general populace and Judge Campbell's dismissal under CELA text in Rule 56E. As to Mr. Chapman's allegation that he had a working disability, that claim is just officiated by the fact that he could work eight hours at a sedentary job. What he's in right now, called security control, is the guy that sits at the front gate, checks your ID, and hits a button to open the door. That's a sedentary job. He doesn't lift bags of mail. Judge Reimer, you brought up the limited light duty restriction. This is addressed at page 6, footnote 3 of my brief. This is a jurisdictional bar. There is no interlap between light and limited duty that the Postal Service can dance around with. It's a difference between Title 29, then with the ADA, the Rehabilitation Act, versus Title 5, the Office of Workers' Compensation, and the FECA Act. If someone succeeds in the Department of Labor finding that an injury is work-related, yes, Mr. Hobson is correct. You have to pay them. And the Postal Service theorist might as well give them something to do. There's a lot of people at the Postal Service in security control or filing in the back room that we've got to pay them their full wages anyway. We might as well give them something to do. And, Your Honor, your question about mediation, this is just about money. After he was terminated because he couldn't do his job, he was let go, and the Department of Labor told the Postal Service to pay him, reinstate him, he was given $100,000 in benefits. It wasn't a flat check. He got back pay. He got back sick leave. I can't understand the spreadsheet. But he did receive benefits after the Department of Labor found out that his injury was work-related. And so this payment was for what? This payment was, I think he was, Mr. Hobson, Mr. Chapman, I'm sorry, was terminated in 2002. And remember that the termination was rescinded. He was allowed to send forth different information. He didn't. They waited until October. They terminated him again. After that, he resubmitted information to the Department of Labor, saying that his cervical fusion was actually aggravated by the work injury. And so they reinstated all the off-time pay. He had exhausted his sick leave. He didn't quit. They didn't fire him, but he used up all his sick leave. So after that, he was on an off-pay status. And so they reinstated all that pay as if he had been working that time. So what period of time, then, are we really talking about? I don't think we're talking about any time at all. As of September of 2001, when he came in with that letter from Dr. Lightletter saying, these are my restrictions. You compare it to the essential duties. We're not dealing with a case about postal regulations, about being racked, as they call it. It's a horrible term. Being sent to the reasonable accommodations committee. We're saying, right then, at that date, here's your restrictions. What can you do? It's sent to the postal medical unit. They send back a form. It's got two columns. Here's what the doctor says he can do. Here's what the essential functions of his position are. Can he lift mail? No. Can he walk around so much? No. He can't do it. At that point, Vania Thanharden said, can you work on the re-wrap, which is actually under the new reorganization. I understand. The question I was really asking was, is there a defined period for which he claims that he needs to be compensated? And what period would that be? Oh, gosh. That would be after his surgical fusion up until today, Your Honor. There is no indication in the record that he ever recovered from these restrictions. These restrictions were permanent. He stated as much to the reasonable accommodation committee that he was done with his job. Do you have a question, Your Honor? At that point ---- You can't give me so many months or so many ---- Four years? Can you put it somewhat differently and say, you know, apart from what he recovered after the board rule, what dollars are at stake? Pay and suffering. If he feels he was treated improperly by the Postal Service, this would be an equitable damage that I suppose would go to the jury. Pay and suffering from what? Not from his disability, because that's already taken care of. I assume Plaintiff would contend, and I've seen some different allegations in defending Title VII cases, that he feels he was treated improperly by the Postal Service. I don't think he would succeed on that, Your Honors, because the Postal Service had no duty to accommodate him at all. Well, we're just trying to get a defined limit on the dollar amount that's at stake. Can I ---- The United States would ---- I'm quite confused, frankly. Well, I apologize for that. The timeline is actually very long. The United States would contend there was no dollar amount at stake because there was no need to accommodate a person who couldn't do his job. But for the period that he's claiming, what is that? If we would need to stick it into a small period, it would be between the time he came back with a request for accommodation, that would be in January 28th was when the letter was sent, January 24th. January 24th, 2001 ---- I'm sorry, September 24th, 2001, he submitted a written request for accommodation. Four days later, they said they didn't have jobs that could fit his accommodation. So we're dealing with four days. That satisfies the Rehabilitation Act. As far as submitting him to the district reasonable accommodation committee, that's above and beyond. And the Coons case cited a ---- How far back did his ---- did the recovery? I think Judge Fletcher is just trying to ask a very practical question. I mean, we all understand what the government's position is. That's not the point. You say he doesn't get a dime. Correct. We understand that. But he got X dollars as a result of the board's ruling. What did he ---- what was he compensated for? I'm unable to answer that question, Your Honor. I have not looked at the award letter for about two days. I was concentrating on the other timeline. Yeah, okay. So I apologize. I believe it was after the cervical fusion, which would have been in 2001, when he was ---- when he was walked off the floor. Again, with the accommodation, however, I would draw Your Honor's attention to the Coons case cited at page 34, as well as the citation sent in the United States May 6th 28J letter, that because Mr. Chapman could not do his job and slash or because he was not disabled as compared to people in the general population, which Judge Campbell ruled on page 7 under the SELA tax, there's no need to even look at the accommodation issue. Second, if Your Honors choose to look at the accommodation issue, I would draw your attention to pages 35 through 36 of my brief, in which the United States set out all five times it had tried to accommodate him, and Mr. Chapman failed to submit to anything. All the DRAC did was state you can't do your job as a mail handler, so you can either take disability retirement. We're not going to flat out fire you. You can take disability retirement or you can go into the bid system. The 11th Circuit case in Daubert, it's not the good Daubert case that we're all familiar with, states that ---- I'm sorry, it's the 10th Circuit case. I said it at page 33 of my brief. You can't usurp an APWU union contract and create a National Workers Board problem by trying to accommodate someone else. But they said we'll bid you into another craft, we'll bid you into a counterclerk, we'll bid you into a mail handler. There's different types of crafts. But he didn't. All he had to do was sign up for something. But he never did. There were five separate occasions.  States that when an employee fails to cooperate with his employer in the interactive process, it's done. It's over. I think a good quote is from the Fifth Circuit's case in the logo sleeve. It's an employee's deafening silence in response to requests for accommodation information can result in a motion for summary judgment for the defendant. And it goes with the retaliation as well. Under the Hankins case on page 37, the Birch case, Sutton v. Ladder, and the Tehan v. Metro-North, which this Court relied on in the Mustafa case cited on page 30 of our brief, if somebody can't do their job, they can let them go and there's no retaliation. That's a legitimate reason for doing what we did. Furthermore, the temporal disparity, and I think that's a very clear cut between the actual EEO actions and the termination, two of which took place three months after he was terminated. One was two years before. There's a different actor, Paul Harris, the Villarmo case, the Ninth Circuit case cited on page 41, and the Hernandez case under the Ninth Circuit cited on page 41 of our brief. Counsel, what we're supposed to decide here is whether summary judgment should have been granted. And are there any open material issues of fact? None at all. Judge Campbell is very blunt about that in his order. He relied on Rule 56e in SILA tax for pretty much every standard that the United States set forth. So isn't that where your argument should be? Perhaps I was overzealous in preparing my outline, Your Honor, but I think that is a chief basis for Judge Campbell's order. As Your Honors are aware, you can affirm the summary judgment on any issue should you even look, choose to go beyond Judge Campbell's decision, and that's why I thought I should brief his inability to work at the Postal Service itself. Judge Campbell did not address that. If there are no further questions, Your Honor. Thank you. Thank you. Mr. Hobson. Mr. Hobson, maybe you can help out a little bit. My understanding that what happened was that Chapman was awarded $87-some-odd thousand based on his base pay rate, effective September 23rd, the date the disability began, calculated at his per week salary, with some adjustments later on. Is that accurate? That's essentially correct, Your Honor. Okay. So if that's true, then he was actually compensated as if he had been working that entire time. Well, it's a little more complicated. I'm sure it is. As a result of being off-duty and unable to be paid, he received wages in the end. Yes. But he had he lost his a lot of property, his house he had to sell. It was sold in a fire sale. His marriage broke up. There were numbers of --. Is that what you're trying to recover for in this lawsuit? Well, there are some emotional distress damages, yes, Your Honor. We've not briefed the issue of damages because we never got there. But his he and there were some small amounts of wages. But in deference to Your Honor and Judge Fletcher, I think the bulk of the wages ultimately were paid to Mr. Chapman. Okay. So now tell me what issues of material fact are in dispute that are critical and need to go back to trial? Well, Your Honor, Judge Campbell said, and I think I fault the lawyer for this. Judge Campbell said that you didn't put in a baseline for how people ‑‑ I think that's how the Justice ‑‑ a baseline for how limited ‑‑ how much ataxia and spasticity exist in the general population. I mean, it was, you know, despite the fact he's got an 80% limitation on his arm and he's got these weight limitations, we'll let him lift more than 20 feet, can only walk 500 feet at any given time, can't stand for more than 10 minutes, that's not substantial, the judge says. And we needed to put in some sort of baseline. I think that's incorrect. I think there are cases that say, and we've cited them in our brief, that say that the jury can look at that and in light of its common sense decide whether that's a substantial impairment or not. You know, I don't think there is a sort of baseline ataxia and spasticity in the general population that exists out there. So the degree to which he is substantially impaired, I think, is an issue that ‑‑ how much of his particular impairment is out there. Isn't the question whether that impairment substantially affects his ability? This is the mind game, and we're both playing it here on it. This is the mind game. Well, he's not substantially ‑‑ I'm in counsel, I didn't mean to interrupt. I know. He's impaired, you're right, but he's not substantially impaired. But, you know, he's so impaired. Remember, he says discipline-free history. He's so impaired he can't do his job. And they say, and counsel says, but you need to understand the male handlers, they are the workhorses. Well, in our briefs we've cited ‑‑ But that's not the pertinent question. I mean, he's not ‑‑ you don't even claim that he is unable to work. He just can't do the job he had. Correct. Okay, so that means he, as a matter of law, he can't be disabled from the working function. I mean, he just cannot be. There are just a bazillion jobs that he could do that don't involve the particular limitations that he has. But in the craft there are lots of jobs. But that's not, under Toyota, what the pertinent question is, is it? Toyota says a particularized inquiry into the disability. Your Honor, my time is up. I just want to finish up. I think I've covered what the court ‑‑ we've cited that portion of their policy, of the policy the interactive process was supposed to have worked in our briefs. So I'll stop there. Thank you, Your Honor. We thank you both for your argument. The matter just argued will be submitted and the court will stand in recess for the day. Thank you. All rise. That, by the way, is a very nice touch, which I wish more lawyers in the universe would do. Well, just permit me the observation that collegiality is a nice thing. You can grab my chair while I'm waiting. Have it weighted down. This court for this session stands adjourned.
judges: Fletcher, Rymer, Duffy